J-A04021-24; J-A04022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.Z.W.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.F. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1210 EDA 2023 |

Appeal from the Order Entered May 4, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000437-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: T.Q.T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.F. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1211 EDA 2023 |

Appeal from the Order Entered May 4, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000439-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: T.L.W.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.F. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1212 EDA 2023 |

Appeal from the Order Entered May 4, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000964-2018

J-A04021-24; J-A04022-24

| IN THE INTEREST OF: T.Z.W.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.Z.W.T., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1284 EDA 2023 |

Appeal from the Order Entered May 4, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000437-2016

| IN THE INTEREST OF: T.Q.T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.Q.T.W., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1285 EDA 2023 |

Appeal from the Order Entered May 4, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000439-2016

| IN THE INTEREST OF: T.L.W.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.L.W.T., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1286 EDA 2023 |

Appeal from the Order Entered May 4, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000964-2018

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED APRIL 3, 2024**

T.Z.W.T., T.Q.T.W., and T.L.W.T. (collectively, "Children") and C.F. ("Foster Mother") filed appeals from the order denying Foster Mother's petition for adoption of Children.[1] We affirm.

The Department of Human Services ("DHS") initially became involved with the family in 2014, and T.Z.W.T. (born August 2014), T.Q.T.W. (born April 2013), and T.L.W.T. (born June 2015) were adjudicated dependent and placed with their maternal grandmother. In 2017, Mother's and Father's parental rights were terminated,[2] and Children were judicially removed from their maternal grandmother. Children were placed with a resource parent in 2019, but were removed from the resource parent and placed with Foster Mother.

L.W. ("Grandmother") and K.W. ("Grandfather"; collectively, "Grandparents"), who are Children's paternal grandparents, became known to DHS in early 2019, and started visits with Children that same year. Visits ceased during the pandemic. In October 2020, when Children were five, six, and seven years old, the court ordered that visits with Grandparents be at

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] We have consolidated the appeals. Order, filed May 22, 2023.

[2] The trial court terminated Mother's and Father's parental rights in 2017. Mother appealed and the Pennsylvania Supreme Court remanded for the appointment of a guardian ad litem ("GAL") for the oldest child. Mother's rights were terminated again in 2020.

Children's discretion. Also in October 2020, Children's older brother, T.Q.K.W.T., who is not a party to this appeal, was placed with Grandparents. N.T., Dec. 8, 2022, at 18-19. They adopted him in February 2022. In March 2022, Children stopped attending visits with Grandparents. That same month, Grandparents filed a petition for adoption of Children. Foster Mother filed a counter-petition for adoption in May 2022.

At a hearing, T.Q.T.W., who was then nine years old, testified that he lived with Foster Mother, whom he calls, "Mommy." N.T., Dec. 6, 2022, at 8. He stated that if he could live anywhere, it would be with Foster Mother. *Id.* at 9-10. He stated that he does not want to see Grandmother because she was "always being mean to us." *Id.* at 12. As an example, T.Q.T.W. stated that when they wanted to watch something, Grandmother would let T.Q.K.W.T., who lived with Grandmother, watch what he wanted. *Id.* He testified that Grandmother always did what T.Q.K.W.T. wanted to do, not what T.Q.T.W wanted to do. *Id.* at 15. T.Q.T.W. testified that with Foster Mother he goes outside, to the park, to resorts, and to football practice. *Id.* T.Q.T.W. also testified that during one visit to Grandmother's house, she wanted to take them to the zoo, but T.Q.T.W. did not want to go and when he asked Grandmother to call Foster Mother, Grandmother responded, "No, walk home." *Id.* at 19.

T.L.W.T., who was seven years old, also testified and said that he has lived with Foster Mother for four years. *Id.* at 22. He likes living with Foster Mother because she "buy[s] us everything," including new clothes and toys.

*Id.* He testified that he shared a room with T.Z.W.T., which he liked. *Id.* at 23. He stated that if he could live anywhere, he would live with Foster Mother. *Id.* He testified that he was excited to see T.Q.K.W.T. in the hallway but would not like to see him more because he was "always trying to fight" Children. *Id.* at 26. T.L.W.T. also stated he was "a little bit" excited to see Grandparents. *Id.* at 27. He testified he did not have fun when he went to Grandparents' house because Grandmother always let T.Q.K.W.T. do things before him and his brothers. *Id.* at 28. He also testified that when he wanted to go to the zoo, she said no. *Id.* He stated that he had on another occasion gone to the zoo with Grandmother, but that was the only thing they did. *Id.* He further testified that he did not want to live with Grandmother because he thought "she [was] going to give [him] to some – a different person." *Id.* at 29. He testified he wanted to stay with Foster Mother because she "buys everything and give[s them] stuff." *Id.* at 30.

Grandmother testified that she is the paternal grandmother to T.Q.K.W.T., T.L.W.T., T.Q.T.W., and T.Z.W.T., and had adopted T.Q.K.W.T. in February 2022. N.T., Dec. 8, 2022, at 6. She stated she first learned Children were in DHS's care in 2017, when they were with their maternal grandmother, and in 2017 or 2018 her son informed her Children were being removed from maternal grandmother's care. *Id.* at 7. Prior to that she saw Children once or twice every month or two, including for family birthday parties and her mother's funeral. *Id.* She testified she was there for T.Z.W.T. when he was in the hospital. *Id.*

Grandmother testified that in 2018 or 2019 DHS approached Grandparents about being caregivers, but they lived in a one-bedroom apartment at the time and DHS required that they live in a larger apartment. *Id.* at 12-13. Grandmother testified she did not make herself available in 2017 because Children were with their maternal grandmother. *Id.* at 24. In 2019, Grandparents took the required classes to become foster parents and in October 2019 they obtained a larger apartment. *Id.* at 11, 13. Grandmother testified that she started visits with the Children in late 2019 or early 2020, and at first it was once a week; one week she would have Children at Community Umbrella Agency Tabor ("Tabor" or "CUA") and the next week she would have them all day on Saturday. *Id.* at 15. She testified that there had been only one concern, where the boys were jumping on the couch and she told them to stop, and "they started calling [her] mean, and they told [her] that, '[W]e can do what we want to do. You're not our grandmother.'" *Id.* at 16. She said she told the resource parent and others about the incident. *Id.* Grandmother testified that it was her understanding that Children wanted to be with her, and they had never expressed to her that they did not. *Id.* at 17.

Grandmother testified that during an overnight visit, T.Q.T.W. was crying because his ear piercing was infected. *Id.* at 19. Grandmother was unable to remove the earring and she called the case manager Samyra Cobbs. *Id.* Grandmother said that that night, T.Q.T.W. asked why T.Q.K.W.T. lived with Grandparents, but Children did not, and she tried to explain. *Id.* She further stated she had asked Children where they wanted to live, and they

said they "want[ed] to be with [Grandmother], but they do not want to get in trouble, whatever that means." *Id.* at 34. She testified that she told "them" that the kids wanted to live with Grandparents, but afterward she had only one more visit before the visits ceased. Id. at 18, 23.

The case manager at Tabor, Samyra Cobb, testified that she had been the case manager for Children since December 2020. *Id.* at 52. She stated she visits Foster Mother's home once a month. *Id.* She testified that from a review of the case file she learned that Grandparents made themselves available as a resource in March 2019. *Id.* at 54. She testified Children were placed with Foster Mother in June 2019. *Id.* at 61. She stated that Children were not placed with Grandparents at that time because they needed a larger apartment. *Id.* at 62. Cobb testified that Grandparents' home was approved, and they were available resources, in October 2019. *Id.* at 64. She stated Children did not move at that time because the child advocacy team did not agree to the relocation. *Id.* at 65.

Cobb testified that Children have repeatedly expressed a desire to live with Grandparents. *Id.* at 67. She further testified that visits stopped in March 2022 because Children expressed they did not want to continue. *Id.* She stated that one of the children had expressed that Grandfather had hit him, but when they "explored, his story was very inconsistent." *Id.* at 68.

Cobb said Children had visits with Grandparents in 2020, and the visits stopped during the pandemic but resumed when the pandemic rules were

lifted. *Id.* at 69.[3] She stated that in February 2022 the boys expressed that if they had visits with Grandmother they would get in trouble and that they would be removed from Foster Mother, who would not know where they were. *Id.* at 70-71. Cobb testified that she asked one of the boys why he thought Foster Mother would not know where they were if they were removed, and the child told her that Foster Mother had said that. *Id.* at 97-98.

Cobb testified that during her time managing the case, Foster Mother had not been compliant with providing Children's medical care and therapeutic services. *Id.* at 72. She stated that when therapy services began a few months before the hearing, she learned Children would sometimes be late to sessions, and some sessions had to be rescheduled. *Id.* She testified therapy was stopped after the school year because Children attended a therapeutic summer camp and, when therapy was due to resume, Foster Mother told the therapy team that she could not do the original time. *Id.* at 72-73. Cobb said it took a while to find another time that worked for all three therapists, and it was not scheduled until November. *Id.* at 73.

Cobb testified that she learned in summer of 2022 that Children were not compliant with the medical and dental appointments, and she brought this

---

[3] It is unclear when visits resumed following the pandemic shut-down. Cobb testified that Grandparents had weekly visits with Children from September 2021 to March 2022. N.T., Dec. 8, 2022, at 68-69. However, she also testified that visits were inconsistent prior August 2021, which is why visitation was included in Foster Mother's plan of correction. *Id.* at 91.

to Foster Mother's attention. *Id.* at 74-75. They were brought up to compliance about a month before the hearing. *Id.* at 75.

Cobb testified that during one of Children's visits with Grandparents, she received a phone call from Grandmother regarding T.Q.T.W.'s ear piercing infection. *Id.* Cobb stated she took T.Q.T.W. to the emergency room, and that the doctors thought they would need to do surgery to remove the earring due to how bad the ear was infected but they were able to remove the earring and give him an ointment. *Id*. at 76. Cobb said Foster Mother had pierced Children's ears without DHS's consent and had not provided Grandparents any medication to treat the infection. *Id.* at 118-19.

Cobb next testified regarding concerns that Foster Mother was not ensuring Children took their medications and not properly storing medications. Cobb testified that in the summer 2021, she saw that Children had received the same prescription from different doctors in the same month, which confused her. *Id.* at 76. At a meeting with Foster Mother, she learned Foster Mother had a full bottle of expired medication, even though Foster Mother said she had been giving the medication. *Id.* at 77. Cobb stated they called off the adoption and created a plan of correction. *Id.* The plan of correction addressed medication, education, clearances, and visits. *Id.* at 84.

Cobb testified that the plan of correction required that the medication be locked up and out of Children's reach, and that DHS was to sign off on all medications. *Id.* at 85. She said the medication had been out on the table, and not locked up. *Id.* at 85-86. She further testified that even after the plan

of correction was in place, during one of her visits, she observed T.Q.T.W. attempt to administer his own medication, and she told him not to do so. *Id.* at 86. He replied that he always gives himself his medication. *Id.* Cobb testified that when she told Foster Mother that she observed T.Q.T.W. about to take the medication, Foster Mother said "No, he wasn't." *Id.* She stated that Foster Mother then went to give T.Z.W.T his medication, and T.Z.W.T. said that he had already taken the medication that morning. *Id.*

Cobb further addressed education concerns. Cobb testified that T.Q.T.W. had failed a grade and was having trouble in third grade, and Foster Mother was receiving calls from school about both T.Q.T.W. and T.L.W.T. *Id.* at 78. Cobb stated she spoke with the school and learned that T.Q.T.W. and T.L.W.T. were in the office almost every day, and that school officials informed her they thought it was an educational, rather than behavioral, issue. *Id.* at 79. She learned that T.Q.T.W. was in danger of failing again because he was not turning in his homework. *Id.* Cobb had seen T.Q.T.W. do his homework, and asked Foster Mother to drop the homework off at school. *Id.* She further testified that Foster Mother had to pick up T.Q.T.W. and T.L.W.T. from the private school once or twice a week due to their behavior, and the private school had asked T.L.W.T. to not return. *Id.* at 168.

Cobb stated that she also had a conversation with Foster Mother about Children potentially having learning disabilities, as she had seen them struggle with homework. *Id.* at 80. Foster Mother responded that she did not want to get Children evaluated because she did not want Children to be "labeled." *Id.*

After Cobb brought her concerns to the child advocacy team and DHS, a court appointed special advocate ("CASA") became Children's educational decision maker. *Id.* Cobb stated that the CASA had T.Q.T.W. and T.L.W.T. evaluated and both had learning disabilities. *Id.* at 80-81. Cobb testified that the private school that Children were attending had not been responsive to the CASA, and the CASA had just transitioned Children into a public school so that the CASA could get them the proper services. *Id.* at 81, 84.

Cobb stated Children were evaluated in November 2021, but the county did not include the CASA in the communications and therefore the CASA had been unaware of the initial evaluation. *Id.* at 83. Cobb testified that she learned in January 2022 that services were needed, and that Foster Mother had been aware of the need since November 2021. *Id.* She stated there had been missing information on the form for the evaluation, and the county reached out to Foster Mother to provide information, which she did not provide. *Id.* at 84, 112.

Cobb further testified that in August 2021, they learned that Foster Mother's paramour and Foster Mother's children sometimes acted as caregivers for Children. *Id.* at 87. She informed Foster Mother that Tabor needed clearances for anyone who played a caregiver role. *Id.* Cobb stated that when she attempted to get information on the paramour and Foster Mother's children, Foster Mother stated she would have to get the information from her children. Cobb stated that was "fine," but Foster Mother then said that she and the paramour were no longer together, she did not have

information for him, and did not know where he was. *Id.* at 87-88. Cobb received clearances for the children, but not the paramour, and stated that she did not know whether the paramour continued to be in a caretaker role for Children, but she once saw him on the back porch of the home. *Id.* at 88.

Cobb next addressed the visitations with Grandparents. She stated that the visits were inconsistent because Foster Mother would be late or would not show up. *Id.* at 89. Cobb testified that Foster Mother said that she was late because Children were on the school bus, and Cobb told her to pick Children up from school on visit days. *Id.* at 89-90. Cobb stated they still were late to visits. *Id.* at 90. She testified that the policy is to cancel visits if parties are 15 minutes late, but because of the distance and because T.Q.K.W.T. was there already, the visitation coach would let the visit happen even if they were more than 15 minutes late. *Id.* Cobb testified that after the plan of correction, the visits were consistent. *Id.* at 91. She stated Foster Mother still was late sometimes, but not as late as before. *Id.*

Cobb stated that with regard to the items on the plan of correction, she still had concerns regarding the lack of clearances for the paramour and the visits. *Id.* at 92. She stated the concerns regarding school were resolved because the Children were now in public school, which allowed the CASA to effectively do her job as educational decision maker. *Id.* Regarding the medication, Cobb stated that she had observed that the medication was locked up away from Children. *Id.*

Cobb testified that Children had attended child prep services to prepare for adoption, but the child prep agency wanted them to "do another round," as they missed several visits. *Id.* at 93. She stated that child prep reached out to her twice to speak with Foster Mother regarding the importance of the child prep visits. *Id.* Cobb further testified that DHS has revoked its consent for Foster Mother to adopt Children. *Id.* at 94.

Cobb testified that she had never implemented a plan of correction for a foster parent before and had not heard of plans of corrections for foster parents. She stated that the child advocate had been unaware of the concerns before August 2021 and wanted to give Foster Mother a chance to get things in order. *Id.* at 95-96. Cobb stated that there would have been a recommendation to remove Children had the plan of correction not been implemented. *Id.* at 96.

On cross examination, Cobb testified that Children have told her they do not want to see T.Q.K.W.T. because he hits them and calls them names. *Id.* at 101-02. She further stated that T.L.W.T. said that Grandfather hit him, and a hotline report was made and investigated. *Id.* at 103-04. Cobb also admitted that in an October 2021 email, she wrote that T.L.W.T. expressed that he did not want to visit Grandparents because they were mean. *Id.* at 115. She explained that when she spoke to T.L.W.T. about why he did not want to go to the visits, he said that T.Q.K.W.T. hit them and called them names, and she responded, "Isn't that what you do? You guys . . . do amongst yourselves?" and he agreed. *Id.* at 125-26.

Cobb testified that she is concerned that if Foster Mother adopts Children, she will not be able to meet their educational and medical needs without intervention by CUA and the involvement of DHS and concerned that Children's relationship with their brother and Grandparents will not be sustained. *Id.* at 123. She testified she did not have concerns if Grandparents were to adopt Children and believed Grandmother can meet Children's needs. *Id.* at 94 and 123. She said she had observed two or three visits between Grandparents and Children, and that when Children would see Grandparents and T.Q.K.W.T., "they would be excited to see them," and "their interactions with each other were pleasant." *Id.* at 155. She stated that "as recent as court on Tuesday, when they saw their grandparents, when they saw [T.Q.K.W.T.,] their face[s] lit up," and they immediately ran to hug them. *Id.*

On re-direct, Cobb testified that when she observed Children together, "Some days are good, some days they're fighting with each other, calling each other names, hitting each other." *Id.* at 166. She said that, based on her observations, she did not observe anything different or out of the ordinary "than what they were describing with [T.Q.K.W.T.]." *Id.* at 167.

Visitation coach Tiffany Owens testified that she supervised the visits between Children and Grandparents from December 2019 through March 2022. N.T., Dec. 15, 2022, at 8. She said the visits were not consistent because Foster Mother often had issues bringing Children to the visits. *Id.* at 9. She stated that Foster Mother was unable to bring Children one time because she did not have gas, and Foster Mother often was late. *Id.* at 11.

She also said that T.Q.T.W. missed some visits because he had headaches. *Id.* She testified that on those occasions, however, the other children said he was fine and it was Grandmother who had told them he had a headache, not T.Q.T.W. *Id.* She stated Foster Mother had a long distance to travel, but that she was late both when the appointments were from 4:00 to 5:00 and from 5:00 to 6:00. *Id.* at 11-12. Owens testified that she did not have any concerns regarding Grandmother's interaction with Children. *Id.* at 9. She further stated that Children often expressed that they wanted to go with Grandmother and continued to express this desire in March 2022. *Id.* at 9-10. Owens said that sometimes Grandmother was in the room when Children said they wanted to live with her and sometimes Grandmother was not in the room, and that they sometimes spontaneously told her they wanted to live with Grandmother. *Id.* at 13-14. Owens testified that Children would see T.Q.K.W.T. about to leave with Grandmother and ask if they could go too. *Id.* at 17.

A supervisor for Tabor, Justina Sherman, testified that she had the opportunity to observe Children in Foster Mother's home and did not have concerns. *Id.* at 30-31. She stated that in July 2021, following the concerns raised by Cobb regarding the medication, the child advocate requested that the adoption by Foster Mother be put on hold. *Id.* at 36. Sherman further testified that she had previously never implemented a plan of correction for a foster parent, but Foster Mother complied with the plan. *Id.* at 36, 38.

Sherman further testified about issues between Cobb and Foster Mother. *Id.* at 39. She stated each felt the other was not talking to her properly, and

Sherman said she began to attend visits with Cobb because of their relationship. *Id.* at 39-40. She testified that the provider foster agency sent an email stating that it had been reported that Cobb had been extremely rude to Foster Mother, as Cobb arrived at the home and did not acknowledge Foster Mother before saying she needed to speak with Children. *Id.* at 41-42. After a conversation with Children, Cobb told Foster Mother to stop coaching Children and asked why she didn't want Children to be with Grandmother. *Id.*. The email stated that Cobb "cannot continue belittling our resource parent, especially not in her own home." *Id.* at 42.

Sherman agreed that if a child in DHS custody needs therapy, it is the CUA's responsibility to refer the child to therapy, and the CUA would "work together" with the foster parent and make referrals if the foster parent needed assistance. N.T., May 4, 2023, at 71-72. Sherman said that she believed Cobb referred Children for therapy. *Id.* at 73. She further testified that if the resource parent needs help finding therapy, the CUA will reach out to agencies and help them connect. *Id.* at 75. Sherman stated that she believed that Foster Mother could provide what Children needed without the assistance of Tabor or DHS. *Id.* at 79.

The case manager from Tabor that was on the case from October 2017 to January 2019, Crystal Akines, testified that there had been efforts to place Children with family members, but they were not aware of Grandparents at that time. N.T., Dec. 15, 2022, at 46-47. She further testified that she had conversations with the child advocacy team regarding Children being placed

with a family member, and the child advocate had said, "As long as I am the worker on this case, it would be over my dead body that the children would return to mother or any of their family members." *Id.* at 48.

Foster Mother testified that Children had been in her care since 2018. *Id.* at 64. She stated Grandparents became involved a year or two after Children were placed with her. *Id.* at 66. She testified Children go to church, sing in the choir and play football, and that she put them in a private Christian school. *Id.* at 67. Foster Mother said they traveled to about five different states "to introduce them to a better way of seeing life, and traveling." *Id.* She also taught them how to cook, including eggs, sausage, quiche, chicken, fish, crabs, and "a whole slew of different foods." *Id.* at 67-68.

Foster Mother said she was often late to visits because of the traffic, but things improved when she started picking Children up from school, rather than waiting for the bus to arrive home. *Id.* at 71-72. She stated Children did not express anything concerning after visiting with Grandparents. *Id.* at 72. Foster Mother testified the visits became discretionary because Children were fighting with T.Q.K.W.T. and Owens would have to stop the visit. *Id.* at 73. She stated she would never coach Children not to want to spend time with Grandparents. *Id.* at 74. Foster Mother testified that when Cobb asked her why she did not want Children to be with Grandparents, Foster Mother asked Cobb why she wanted to put Children "back in harm's way," and why she would not listen to Children. *Id.* at 75. She stated Children told her that Cobb called T.L.W.T. and

T.Z.W.T. liars, and Children said, "Mommy, . . . I don't want to talk to her no more." *Id.*

Foster Mother next testified regarding the medication. She stated that when Cobb found the expired full bottle of medication, she and Children had just returned from Virgina and she had thought she had left a bottle of medication behind. *Id.* at 76. She received a prescription for, and bought, another bottle of medication, and when she found the lost one, she combined them. *Id.* at 77-78. She stated that on the morning on which Cobb thought T.Z.W.T. administered his own medication, Cobb had arrived at 7:00 a.m., when Foster Mother and Children were getting ready and "[T.Z.W.T.] always plays with you and say[s], 'I got this. No, I don't have that.'" *Id.* at 81. She testified he was playing when he said he had already taken the medication. *Id.* Foster Mother testified that after the correction plan, she used sectional pill containers and put the medicine in a high, locked cabinet. *Id.* at 84.

Foster Mother testified Children were on the "honor roll" and did their homework, but "for some reason [T.L.W.T.] was not getting the homework from home to school." *Id.* at 83. She also stated that part of the correction plan was for her to attend parent-teacher conferences. *Id.* at 84. On cross-examination, Foster Mother admitted that Children received some Cs and Ds on their report cards, and although some were for behavior or handwriting, T.Z.W.T. and T.Q.T.W. both received a D in math. *Id.* at 121-23.

Foster Mother testified that T.Z.W.T. did not want to go to Grandparents' house because they let T.Q.K.W.T. do what he wanted and eat what he

wanted, but did not let Children do the same. *Id.* at 87-88. She said T.L.W.T. did not want to go back because Grandfather slapped him in the mouth with a belt. *Id.* at 88. Foster Mother stated she did not see any visible marks on T.L.W.T. *Id.* at 131. Foster Mother also said that Grandmother told her to not bring T.L.W.T. back. *Id.* at 90. She stated that T.Q.T.W. told her Children did not want to spend the night at Grandparents' house, but Cobb and Grandmother insisted they stay. According to Foster Mother, T.L.W.T. told her that he asked Grandmother to call Foster Mother to come get him, and Grandmother told him to walk home. *Id.* at 92.

Foster Mother testified that she had not known that she was not allowed to get Children's ears pierced, stating it was not covered in any of her certification classes. *Id.* at 96-99. She testified that she had not been informed that Children might be removed from her home and that no one told her that the consent to adopt had been revoked, but she did know that the plan of correction stopped the adoption. *Id.* at 106-08.

Foster Mother testified that T.Q.T.W.'s ear infection was not serious, and "[h]e had the solution that they gave him when he got his ear pierced." *Id.* at 113. She stated that when she found out his ear was infected, she "took the earring out of his ear, but he snuck his earring back all the time." *Id.* at 113. He was eight years old. *Id.* Foster Mother testified that T.Q.T.W. told her that when he was at Grandparents' house, he took the earring out of his ear at 11:00 p.m. and gave it to Cobb, who took him to the emergency room. *Id.*

at 116. She further testified that Children had not been out of compliance with their medical care. ***Id.*** at 118.

Foster Mother testified that Children missed "[m]aybe three days out of the [school] year." ***Id.*** However, according to report cards, T.Z.W.T. had missed 14 days of school and was late ten days. ***Id.*** at 119. T.Q.T.W. missed 18 days of school and was late seven days. ***Id.*** at 120. T.L.W.T. missed 16 days of school and was late 15 times. ***Id.***

Foster Mother's daughter-in-law, Natasha Rivera, testified that she witnessed Foster Mother with Children at family and church events and they have normal mother-child relationships. N.T., May 4, 2023, at 23. She said that Children refer to Foster Mother as "mom," they are "upkept, clean cut," and well-mannered, and they are happy. ***Id.*** at 24-26. She testified they were comfortable and "laid back" at Foster Mother's house. ***Id.*** at 26.

DHS permanency worker Mary Kelly testified that she had been assigned to the case since 2019. ***Id.*** at 30. She testified that Grandparents made themselves available around the time that Foster Mother was assigned to Children. ***Id.*** at 31. She explained that Grandparents were not an appropriate resource at that time because they had to move to a bigger apartment, which they did. ***Id.*** at 31-32. Kelly further testified that it was her understanding that in March 2019, Grandparents attempted to go to a court hearing to make themselves known, but they were denied entrance. ***Id.*** at 42-43. When asked what DHS recommended as to adoption, Kelly responded, "Well, we know that certainly by law that family's first, and that is what [DHS] has always tried to

- 20 -

do; so we would be recommending that family, unless they're ruled out, be first." *Id.* at 33. She testified that Grandparents have not been ruled out by DHS or Tabor. *Id.* When asked whether she believed it would be in Children's best interest to be placed with family, Kelly stated, "That is our mandate" and that she "believe[s] that [placement with] the family, when thoroughly explored and not ruled out," is in a child's best interest. *Id.*

Kelly testified that in March 2022 she had been tasked with asking Children if they wanted to visit Grandparents, and from March through August 2022, Children did not want to visit them. *Id.* at 34. She testified that when she asked Children, they were in Foster Mother's house, but Foster Mother was not in the room. *Id.* at 43. She further stated they there were concerns that Foster Mother was coaching Children, but the concerns were not verified. *Id.* at 44. She testified that Children were not moved from Foster Mother to Grandparents because "there was no agreement by all parties." *Id.* at 39.

Child advocate social worker, Erica Cook, testified that she had been assigned to the case since 2018 and Children have never asked to visit or live with Grandparents. *Id.* at 49. She stated that Children say they do not want to see T.Q.K.W.T. because he is not nice, hits them, makes them do what he wants to do, and does not share. *Id.* Cook testified that Children were not living with T.Q.K.W.T. because he had been physically injuring Children. *Id.* at 50. She further testified that at "inner-agency meetings," it had been expressed that Grandparents wanted T.Q.K.W.T. and T.Q.T.W., but not T.L.W.T. and T.Z.W.T., because "it was too much to handle for [G]randparents

to have all the siblings." *Id.* Cook said that Children have been with Foster Mother since 2019 and that they call her "Mom." *Id.*

Cook testified that initially Cobb asked the boys each week whether they wanted to visit Grandparents and, when Cobb asked, the visits occurred. *Id.* at 51. She stated that the visits ended early because "some of the kids wanted to leave." *Id.* She testified that when she asked Children herself if they wanted to visit Grandparents, they said, "No." *Id.* Cook agreed that there was a concern about Cobb's questioning of Children versus what Children told other people, and that the solution was for Kelly to ask about visits. *Id.* After Kelly started asking, there were no more visits. *Id.* at 52. Cook stated that she believed Children should live with Foster Mother. *Id.*[4]

Following the hearing, the court denied Foster Mother's petition for adoption and found that Children were "free to be adopted by [Grandparents]." *See,* Order Denying Petition/Motion, CP-51-AP-0000437-2016, filed May 4, 2023. Foster Mother and Children filed appeals.[5]

Foster Mother raises the following issue: "Did the trial court err by not considering the best interests of Children when denying the [Foster Mother's] Adoption Petition?" Foster Mother's Br. at 5.

_____

[4] The GAL stated that it was a hard case, but her recommendation was that Children reside with Grandparents. N.T., May 4, 2023, at 104. She stated that, "As much as I hate to hurt this woman, family is family, and they've been trying since 2019." *Id.*

[5] Foster Mother filed in this Court an emergency stay of final order of trial court, which this Court granted in May 2023.

Children raise the following issues:

> A. Did the trial court err as a matter of law and abuse its discretion in denying [Foster Mother's] petition for adoption, where the evidence was insufficient to support a conclusion that adoption by . . . Grandparents best served the Children's needs and welfare, and the trial court did not adequately consider the best interests of the Children?
>
> B. Did the trial court err as a matter of law and abuse its discretion by elevating the preservation of [Children's] biological connection with . . . Grandparents over the remaining factors that bore on the Children's best interests?
>
> C. Did the trial court err as a matter of law and abuse its discretion by admitting hearsay testimony, and was it not harmless?

Children's Br. at 4 (answers below and suggested answers omitted).

We first will address the claims that the court erred in its best interests analysis. Foster Mother contends that the trial court "attempted to support its decision to deny [her] Petition to Adopt post hoc, by citing random passages in the Notes of Testimony and stating conclusions without providing any support whatsoever as none exists." Foster Mother's Br. at 7. Foster Mother cites portions of the trial court opinion in which she alleges the support cited by the court did not support its claims. For example, she notes that for the court's finding that it did not find her testimony credible, it cited almost her entire testimony, and claims the finding cannot be supported by the testimony cited. As another example, she contends that "[a] reading of the notes of testimony the trial court cites in support of its contention that [Foster Mother] coached the Children reveals not a single iota of coaching." *Id.* at 17.

Further, although Foster Mother admits that the trial court citation supported its conclusion that Foster Mother convinced Children they should not visit Grandparents, she faults the court because her testimony contradicted this statement. She notes that DHS could have requested that Children be removed from her care prior to the adoption petitions, but did not. Foster Mother further points out that the two children who testified stated they wanted to live with Foster Mother, and corroborated her testimony. Foster Mother contends the court "did three things in an attempt to justify its clearly flawed decision" – it failed to provide citations to the record to supports its conclusions, it cited random and inapplicable testimony to support its conclusions, and it ignored testimony that did not support its decision. *Id.* at 21.

Children argue that they have been with Foster Mother for four years, have a routine and friends, and are integrated into their church community and extended family. They point out Grandparents did not come forward as resources until 2019. They argue that the only person advocating for Children to be placed with Grandparents was Cobbs, "whose interactions with [Foster Mother] were so fraught that her supervisor had to shadow her for every interaction with [Foster Mother], and she was prohibited from speaking to the Children about visitation." Children's Br. at 40. Children maintain that the court based its opinion "solely on its concerns regarding [Foster Mother's] perceived inadequacies as a parent, without any consideration of the Children's bonds with her, their lack of bond with . . . Grandparents, and

[Foster Mother's] compliance with the plan of correction." *Id.* at 41. They further maintain the court employed "a deeply selective, and at times incorrect, presentation of the evidence," to conclude it would be in Children's best interest to be removed from Foster Mother. *Id.*

Children maintain the testimony "overwhelmingly supported adoption by [Foster Mother] as the outcome most consistent with the Children's best interest." *Id.* at 42. They note they have been in Foster Mother's home since 2019, call Foster Mother, "mom," and T.Z.W.T. and T.Q.T.W. testified that they wanted to remain with Foster Mother. They point out that the child advocate testified it would be in Children's best interest to be adopted by Foster Mother. Children note that Foster Mother complied with the plan of correction, claiming that after the plan of correction, there were no issues with medication, except a disputed incident, Children were assigned a CASA to assist with getting IEPs, and Foster Mother ensured Children arrived on time for the visits. Children point out that when Kelly, rather than Cobb, began to ask whether Children wanted to attend visits, they no longer attended. They further note that Sherman testified she believed Foster Mother could meet Children's needs and claim that when Kelly was asked whether placement with Grandparents would be in Children's best interest, "she demurred and said only that placement with family is DHS'[s] mandate." *Id.* at 46.

Like Foster Mother, Children claim "the factual support on which [the trial court relies on to support its conclusions] . . . is unsupported by the record, and the inferences, deductions, and conclusions it draws from that

- 25 -

evidence are unreasonable and constitute an abuse of discretion." ***Id.*** As an example, Children claim that there was not support for the court's finding that Foster mother withheld the results from the IEP evaluations or that she tried to bypass DHS's policy requiring clearances. Children further contend that the court did not weigh the bond between Foster Mother and Children when making its decision.

We review a trial court's custody determination for an abuse of discretion. ***In re K.D.***, 144 A.3d 145, 151 (Pa.Super. 2016). "An abuse of discretion does not exist merely because a reviewing court would have reached a different conclusion." ***Id.*** This Court "will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." ***Id.***

Further, our review of decisions under the Adoption Act "is of the broadest type," and we are "not bound by the trial court's deductions, inferences and interpretations of evidence and we will exercise independent judgment to consider the merits of the case and to enter an Order that is correct and just." ***Id.*** (quoting ***In re Adoption of D.M.H.***, 682 A.2d 315, 318 (Pa.Super. 1996)). However, "on issues of credibility and weight of the evidence, we must defer to the findings of the trial judge who has had the opportunity to observe the proceedings and the demeanor of the witnesses." ***In re Adoption of D.M.H.***, 682 A.2d at 318.

When determining whether to grant a petition for adoption, the "court shall hear testimony in support of the petition and such additional testimony as it deems necessary to inform it as to the desirability of the proposed adoption." 23 Pa.C.S.A. § 2724(a). Further, "the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child." *Id.* at 2724(b). When addressing an adoption petition, courts are guided by the best interest standard. *In re B.L.L.*, 787 A.2d 1007, 1015 (Pa.Super. 2001). "The best interest determination in custody and adoption matters is made on a case-by-case basis, and requires weighing of all factors which bear upon the child's physical, intellectual, moral and spiritual well-being." *Id.*

"[T]he preservation of the family is the desired outcome in custody matters." *In re K.D.*, 144 A.3d at 153. However, "[t]he goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." *Id.* (quoting *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa.Super. 2011)).

Here, the trial court concluded adoption by Foster Mother would not be in Children's best interest:

> At the hearing, Foster Mo[ther's] testimony raised serious credibility concerns. During the hearings, Foster Mo[ther] testified about the love and affection she has for Children

while highlighting her poor parenting skills and improper judgment calls over the past four years in regard to the boys' health, safety, and education. Foster Mo[ther] is the fun parent who takes the kids to cool places, feeds them their favorite foods, buys them new clothes, and allows them to ride on dirt bikes. Significantly, the testimony showed that Foster Mo[ther] seems to find traveling with Children more important than ensuring they have the proper services they need to manage their behaviors and the proper educational services to flourish in school. Due to ongoing concerns with Children while in Foster Mo[ther's] care, a plan of correction was implemented, and Foster Mo[ther] has failed to comply with all requirements. The plan addressed education, medication management, therapy,[6] visitation and clearances for anyone who plays a caregiver role to the children.

As for medication management, Foster Mo[ther] has not fully complied with the plan of correction and her testimony raised serious credibility issues in regard to Children's medications. The case worker was not sure if Foster Mo[ther] was in compliance with giving Children the appropriate medications. The case worker observed a full bottle of expired prescription medication in Foster Mo[ther's] home. It was unclear what medications Children were actively taking because Foster Mo[ther] was reporting that medications are being taken by Children, however, her medication logs are inconsistent. The team was trying to figure out whether or not Foster Mo[ther] gave Children the medication and how a full bottle of medication was there if Child received the medication. Foster Mo[ther's] explanation raised a lot of concerns which prompted the adoption to be called off.

Child Advocate admitted that, "Foster Mo[ther] has shown that she cannot manage the needs of Children without the support of CUA and DHS." (Child Advocate's Motion 08/25/2021). Two years following the placement of Children, Child Advocate wanted Foster Mo[ther] to receive additional training so she could better understand the

_____

[6] Although therapy was not included in the plan of correction, the testimony establishes that attendance at therapy was a concern during the course of the case.

process of medication. DHS sent a nurse consult to Foster Mo[ther's] home to work with her to address the medication issues. During a visit after the plan of correction was implemented, the case worker witnessed T.Q.T.W. trying to administer his own medication. The medication was not locked up, but on the table within arm's reach. Foster Mo[ther] was uncertain if Child had taken his medication already but insisted that Child was only playing when he attempted to open the medication bottle in front of Ms. Cobb.

As for therapy, Foster Mo[ther] admitted to knowing that Children had behavioral issues during the four years in her care. When services became available, it was the responsibility of Foster Mo[ther] to ensure that the recommendation from the evaluation was followed through. The younger sibling has not been in therapy from June 2019 until the beginning of 2022 and the older two brothers were in therapy until about 2020. Ms. Cobb completed the intake process at Consortium for therapeutic services. When therapy resumed, Foster Mo[ther] again became a barrier between Children and the services they need. When therapy services began, Children were consistently late or had to reschedule sessions. For the past three months, Children were not in regular therapy, and have only been consistently attending therapy for a month prior to the first adoption hearing. Children have consistently attended therapy for only a month prior to the first adoption hearing.

As for education, Foster Mo[ther] learned Children had a learning disability and behavioral issues about two years prior. Foster Mo[ther] was well aware of her role as the foster parent and the educational decision-maker, however, she failed to ensure that Children were getting all the services they need while in school. Foster Mo[ther's] perception of Children is not based on the facts but rather her own opinion. She testified that Children were honor roll students, however, Foster Mo[ther] was well aware that [one child had] previously failed first grade and that he was in danger of failing third grade. Foster Mo[ther] also knew that Children were having behavioral issues at the private school as she was constantly at the school for one of the Children. Foster Mo[ther] admits that she was told on several occasions by the case workers that Children needed an IEP. Foster Mo[ther] knew the private school did not have

the services available for Children, however, she neglected their educational needs and failed to get them evaluated for services because she did not want them to be "labeled." (Child Advocate Motion 08/25/2021). After being removed from the role of educational decision-maker, Foster Mo[ther] alleged that she never heard of the role. At the time of the hearing, the case worker was uncertain if an IEP is in place for T.Q.T.W. and T.L.W.T. because they recently transitioned into a public school. Foster Mo[ther] continued to be a barrier in regard to Children obtaining the appropriate educational services and deliberately withheld the results of the evaluation for two months from CASA.

Foster Mo[ther] intentionally tried to bypass DHS' policy which requires clearances for anyone that plays a caregiver role to ensure safety of Children. Foster Mo[ther's] paramour was in a caregiver role for the Children at some point in time. Instead of providing the case worker with information on the paramour, she alleged that she was no longer with the paramour and refused to provide the case worker with any information on him. However, following the break-up with paramour, the case worker observed him on her back porch. CUA has still not received any information on paramour for clearances.

Foster Mo[ther] continued to violate DHS' policy when she took Children — seven years old, eight years old, and nine years old – to get their ears pierced without the permission of CUA, DHS, or Children's family. Children wanted their ears pierced, so Foster Mo[ther] took them. Foster Mo[ther] took the classes to become a certified foster parent, but she claimed that the materials did not mention piercings. However, she knew she needed to ask for permission for whatever Children need to be done, such as extractions, receiving oxygen, or having something applied to the Children. Foster Mo[ther] knew T.Q.T.W.'s ear was infected, and she was provided ointment for the piercings, however, when Children went to [G]randmother's home, Foster Mo[ther] neglected to send the ointment. She was watching the infected ear every day, however, T.Q.T.W. was rushed to the hospital due to how badly the ear was infected. Foster Mo[ther] knew that T.Q.T.W. would sneak the earring back into his infected ear but failed to secure the earring in a place T.Q.T.W. could not get to it. The doctors were able to remove the earring without performing surgery

and provided T.Q.T.W. with some ointment. Foster Mo[ther] was supposed to report any injuries but neglected to report the infection. Ms. Cobb took the appropriate measures by seeking medical care for Child's infected ear. Foster Mo[ther] failed to adhere to DHS' policy, by not seeking permission for the permanent bodily changes, by failing to inform the case worker that nine-year-old T.Q.T.W's ear was infected and then by failing to seek medical care for Child's infected ear. She seems to believe her responsibilities as a resource parent are to adhere to all of Children's wants and fulfill what needs she deems as necessary.

Visitation with grandparents was the final piece of the plan of correction. Foster Mo[ther's] main goal was to provide a safe place for children until they could be reunited with parents or with family. She agrees that foster kids should have the opportunity to visit with extended family members, however, her actions throughout this case reflect otherwise. From the outset visits were inconsistent due to Foster Mom arriving late or missing visits entirely, as well as coaching Children into not wanting visits. The correction plan stated that Foster Mom was to be on time for all visits. Per DHS' policy, visits should be canceled after 15 minutes, but considering the distance they were coming from, and that T.Q.K.W.T. would be waiting for them, the visitation coach would still allow visits to take place.

[G]randmother was consistent in attending visits and the visitation coach did not have any concerns regarding the interaction between children and [G]randmother. After the visits with [G]randparents, Foster Mo[ther] stated that the boys did not express anything concerning their grandparents. This Court is not persuaded by Foster Mo[ther's] argument that Children do not want to live with [G]randparents. The visitation coach supervised the visits until March of 2022 and Children were still expressing their desire to live with [G]randmother. Children expressed to the case worker and [G]randmother that if they had visits or live with [G]randmother, they would get in trouble. The visitation coach heard Children ask [G]randmother if they could leave with her on several occasions. Due to the coaching by Foster Mo[ther], Children expressed not wanting to visit [G]randmother because the case worker was going to remove them from the home, and Foster Mo[ther] would not know where they were.

This Court also rejects Foster Mo[ther's] claim that Children do not want to visit with [G]randparents because of their older brother. Foster Mo[ther] falsely stated that the visits became discretional because Children and their older brother were constantly fighting.[7] . . . The Child Advocate social worker stated that Children never told her specifically that their brother was injuring them. The visitation coach testified that issues started occurring at the visits because Children were upset that their brother was living with paternal grandmother and they were not. The testimony demonstrated that the Children wanted to live with [G]randmother, but the necessary steps were not taken to make a positive transition to [G]randmother's house due to the negative influences of Foster Mo[ther].

In March of 2019, prior to Children being placed with Foster Mo[ther], [G]randparents attempted to make themselves available during a hearing, however, they were denied entrance into the Court. The records shows that [G]randmother took the necessary steps to be an available resource for Children only five months after being placed with Foster Mo[ther]. Additionally, Foster Mo[ther's] consents to adopt Children were revoked by DHS and DHS [is] recommending [G]randparents for the adoption of Children. While this Court is mindful that preserving the family unit is an important factor in determining the best interest of a child, it is not dispositive and will not overcome other considerations for the "physical, mental and emotional needs and welfare of the child." 23 Pa. C.S. § 2724 (b). This Court believes that Children will thrive emotionally, mentally, physically while in [G]randmother's care and removal to [G]randmother's home will only reinforce the relationship that has formed between Children and . . . Grandparents. Accordingly, this Court properly denied Foster Mo[ther's] petition for adoption.

_____

[7] The trial court states that "the case worker witnessed Children reciprocating the same type of play with their brother that they engage in with each other while at Foster Mo[ther's]." Trial Court Opinion, filed Oct. 5, 2023, at 35. However, Cobb did not testify that she witnessed T.Q.K.T.W. and Children engage in any behavior. Rather, she testified she witnessed Children engaging in behavior with each other similar to what they described as T.Q.K.T.W.'s behavior. N.T., Dec. 8, 2022, at 125-26, 167.

Trial Court Opinion, filed Oct. 5, 2023, at 30-36 (citations to transcript omitted).

The record supports the trial court's factual findings and its credibility determinations, including its finding that Foster Mother was not credible. Moreover, on this record, it did not abuse its discretion in denying Foster Mother's petition for adoption.[8] Contrary to Children's contention, there was support for the court's finding that Foster Mother intentionally withheld information concerning the IEP and that she bypassed DHS policy regarding clearances. No one but her was aware that the IEP evaluation had occurred and she did not complete the required forms for the county. Furthermore, although Foster Mother stated she no longer was with the paramour, she did not deny that he had been a caretaker, even though DHS had not received information on his clearances, and he was seen at the house after this statement on one occasion.

The testimony supports the court's findings. The court did not ignore any evidence. Rather, it considered the testimony and gave it the weight it deemed appropriate. When considering all evidence presented, the court did not abuse its discretion in finding it would be in Children's best interest to

_____

[8] The court provided incorrect citations to certain testimony. For example, to support that Foster Mother coached Children to not want visits because than they would be removed from Foster Mother and she would not know where they were, the court cited, through an *id.*, the December 15, 2022 transcript at 70-71 and 96-97. The proper citation, however, was the December 8, 2022 transcript at 70-71 and 97-98. Where the record as a whole supports the court's conclusion, such typographical errors do not require reversal.

deny Foster Mother's petition and open Children up to adoption by Grandparents.

Children also claim that the trial court erred and abused its discretion by elevating the preservation of Children's biological connection with Grandparents over the remaining factors that bore on their best interests. Children admit that the trial court "barely touches on the familial relationship between" Children and Grandparents. Children's Br. at 57. They claim, however, that "[i]n the absence of such consideration, . . . its decision is inexplicable, and its opinion reads more like a decision on a judicial removal than a contested adoption." *Id.* Children claim there was "no credible evidence" Children shared a bond with Grandparents, pointing out that Children had declined visits for months. *Id.*

This claim is meritless. The court did not base its decision on the familial relationship between Children and Grandparents. Further, contrary to Children's contention, there was evidence Children and Grandparents shared a bond. Kelly, Cobb, and Grandmother all testified that Children expressed a desire to live with Grandmother. Further, Kelly testified that the visits went well, and Cobb similarly testified that Children "lit up" when they saw Grandparents and T.Q.K.W.T. in the courtroom hallway. As discussed above, the record supports the court's factual findings and credibility determinations, and its decision that denying Foster Mother's petition would be in Children's best interests was not an abuse of discretion.

In their final issue, Children claim the court erred and abused its discretion by admitting hearsay testimony, and the admission was not harmless. They claim that Cobb should not have been permitted to testify as to events she learned from reviewing the record. They argue that from her review of the file she testified to events "regarding the presentation of Paternal Grandparents as a resource, the placement of the Children with [Foster Mother], and the reasons the Children were not placed with Paternal Grandmother in 2019." Children's Br. at 61.

Children did not raise this objection at the hearing. Foster Mother objected based on lack of personal knowledge and hearsay, but Children did not join the objection. N.T., Dec. 8, 2022, at 53-57. They therefore waived the claim. **Amato v. Bell & Gossett**, 116 A.3d 607, 625 (Pa.Super. 2015) (finding evidentiary claim waived where appellant did not join the objection before the trial court).

Regardless, even if it had been preserved and even if it was error, we would find it was harmless because the same information came into evidence through other testimony. Testimony that is erroneously admitted but is cumulative of other, untainted evidence is harmless, and therefore would not have had an impact on the decision. **Blumer v. Ford Motor Co.**, 20 A.3d 1222, 1232 (Pa.Super. 2011) (finding inadmissible reports were cumulative of admissible reports and therefore any error was harmless).

Here, Children objected to Cobb's testimony that Grandparents first became involved in the case in 2019 and that at that time their apartment

was too small. N.T., Dec. 8, 2022, 58-66. Grandmother and Kelly also provided this testimony. *Id.* at 9-13. Further, Kelly also testified that Grandparents attempted to go to court in 2019 to make themselves known. N.T., May 4, 2023, at 42-43. This claim lacks merit.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/03/2024